**R. E. SCHWARTZ, Plaintiff,**

v.

**AUTOBUSES INTERNACIONALES SOCIEDAD DE RESPONSABILIDAD LIMITADA, a Mexican Corporation, Defendant.**

**No. 78–1361C(B).**

United States District Court,
E. D. Missouri, E. D.

Dec. 18, 1979.

Leonard P. Cervantes, St. Louis, Mo., for plaintiff.

John T. Garcia, El Paso, Tex., Robert S. Bogard, St. Louis, Mo., for defendant.

## MEMORANDUM

REGAN, District Judge.

In this diversity action, plaintiff seeks recovery of $80,000 and expenses of $1,000 based on an alleged contract to perform legal services for defendant. In the alternative, a similar amount together with punitive damages is prayed, on the theory that defendant fraudulently induced plaintiff to render his services with no intention of paying the fee. At the conclusion of his evidence, plaintiff added an alternative count in quantum meruit.

Plaintiff is a licensed attorney practicing in St. Louis, Missouri. Defendant is a Mexican corporation engaged in operating a fleet of 32 passenger buses across the frontier between Juarez City, Mexico and El Paso, Texas, pursuant to authorities granted by the Mexican government and the Interstate Commerce Commission.

The complaint alleges that a contract was entered into on or about June 1, 1978, whereby defendant agreed to pay plaintiff a fee of $80,000 for his services if plaintiff was able to obtain approval of the Mexican government for defendant to introduce into its frontier service a new fleet of (used) buses of American manufacture to renew and expand its existing fleet; that plaintiff, with the assistance of Mexican co-counsel, obtained the approval of the Mexican government for the issuance of the necessary permits, and has fully performed every other act required of him to earn the agreed-upon fee; and that defendant refuses to pay said fee.

It is undisputed that because of defendant's concerns relating to the condition of the 32 American-made buses being operated by it between Juarez and El Paso, as well as its desire to expand its frontier service, defendant was anxious to obtain from the Mexican government permits for "frontierizing" 40 other American-made buses with-

out the necessity of paying large import fees which would make the plan uneconomical. However, although similar so-called "conditional" permits of importation had theretofore been granted with respect to its original fleet allowing the importation of the original fleet for use within the border region, defendant had been unsuccessful for a period of time in persuading the Mexican officials to grant the required "conditional" importation permits for the "new" buses.

When in St. Louis to inquire into the possible purchase of old buses from the Bi-State Agency (to be used for "cannibalization" purposes), Dr. Garciagodoy, the president of defendant, was introduced to a Thomas O'Sullivan. Under the erroneous impression that O'Sullivan was an official of the Bi-State Agency, Dr. Garciagodoy related his woes to O'Sullivan, whereupon O'Sullivan professed he could be of assistance to him through "friends," but would require "expense" money. In May, 1978, O'Sullivan requested and Dr. Garciagodoy gave him $4,700 as expense money. This sum was paid in cash because O'Sullivan represented that by reason of personal problems with the IRS he wanted to avoid any contention by that agency that the money was "income" to him. Subsequently, an additional "expense money" payment of $8,500 was made to O'Sullivan. There is no substantial evidence of what, if any, expenses were actually incurred by O'Sullivan other than the payment of $1,000 to plaintiff. So far as the evidence discloses, defendant did not ask O'Sullivan for an accounting of his expenditures from the expense money.

Insofar as concerns defendant, plaintiff's name first surfaced shortly before O'Sullivan requested Dr. Garciagodoy to execute powers of attorney not only for O'Sullivan but for plaintiff and two Mexican lawyers, all three of whom O'Sullivan claimed were "friends" of his who would be working for O'Sullivan on the matter. In the interim, plaintiff had been contacted by a Stephen

Lumetta whom he identified as a business acquaintance, and Lumetta in turn, on May 27, 1978, introduced O'Sullivan to plaintiff.[1] O'Sullivan, it appears, was operating out of Lumetta's office. Plaintiff was made aware by O'Sullivan and Lumetta that what defendant wanted were permits which would allow it to import duty-free for use within the border region 40 newer (but used) buses of American manufacture with which it could renew and expand its existing operating fleet.

After obtaining $1,000 in expense money from O'Sullivan, plaintiff went to Mexico City on June 2 where he retained a Mexican lawyer, Silvino Cortina, as co-counsel. Plaintiff had previously utilized Cortina's services in other matters. Cortina then brought in a young Mexico attorney, Carlos Yanez, and the three lawyers "researched" the Mexican law. In spite of the fact that defendant had in earlier years obtained permits of importations (without payment of import fees) for its existing fleet, as well as defendant's known desire to obtain *similar* permits for the 40 "new" buses, the Mexican lawyers decided (without defendant's knowledge) to by-pass the uncertain and difficult procedures pursuant to which duty-free importation of the buses could be authorized, and instead utilize a new, never before used law which in their judgment would allow defendant to operate new buses in the border region. It was their opinion (which we find to be in error) that inasmuch as defendant already had authority to operate its 32 buses in the border region, no import duties would be assessed on the 40 new buses if they could convince the proper Mexican officials, acting under a "nicety" in the new law, to permit defendant to cancel the registration of its older 32 buses and "provisionally" register the 40 new buses instead.

At the end of June, Dr. Garciagodoy was advised that the desired permits had been authorized and were ready for issuance, and it was not until then that he was told for

---

1. We find from the credible evidence that Dr. Garciagodoy did not know nor had he heard of Lumetta until mid-July when Lumetta appeared on the scene at plaintiff's instance. Lumetta did not testify although he was listed as one of plaintiff's witnesses.

the first time that a fee of $80,000 was being demanded.[2] He immediately rejected that figure as exorbitant. Shortly thereafter, on July 16, 1978, at plaintiff's request, Dr. Garciagodoy came to St. Louis to discuss the matter further. There were discussions that day and the following day, but nothing was resolved, plaintiff insisting on $80,000 and Dr. Garciagodoy taking the position that having already expended $13,000, his total cost should not exceed $20,000, provided he had the permits in hand. The meeting ended in a stalemate, with plaintiff threatening to sue for the fee if defendant would not pay him $80,000.

The matter remained at a standstill until some time in September when plaintiff telephoned Dr. Garciagodoy to the effect that upon payment of a total fee of $17,000 ($10,000 to Mexican counsel and $7,000 to plaintiff) defendant could obtain the permits it desired, clearly implying that they had already been issued. Dr. Garciagodoy agreed to this proposal and arranged to meet plaintiff in Mexico City with the payment. He purchased two cashier's checks, one for $10,000 payable to Cortina and the other for $7,000 payable to plaintiff. However, plaintiff did not keep the appointment with Dr. Garciagodoy.

By this time it had become obvious that no permits of any kind had in fact been issued. Nevertheless, Dr. Garciagodoy was still willing for plaintiff to continue his professed efforts to get the permits, and so informed plaintiff. In the interim, Mexican counsel had done nothing since mid-July to obtain a signed authorization for any per-

mits. When they reopened their "file", the Mexican officials were hesitant to act, due to the absence of any official regulations implementing the statute. The law which Mexican counsel sought to utilize expressly provided that official action was to conform to regulations promulgated by the Secretary of the Treasury. Counsel then sought, through a friendly legal advisor to the Undersecretary of the Treasury, to convince him that no regulation was needed and that the matter was actually within the jurisdiction of another department.

The law in question dealt with "provisional inscription" (or registration) of motor vehicles, and the original application filed by Mexican counsel sought such a "provisional" registration. However, when questions were raised about that, the Mexican counsel filed a new application with the office of Director of Vehicles using the word "substitution" in lieu of "provisional", and allegedly persuaded the legal advisor to give a "favorable" opinion to the effect that the matter was not within the jurisdiction of the Undersecretary, so that (in the view of the Mexican counsel) all that remained to be done was for the Director to sign an official letter allowing the Federal Registry of Vehicles to "substitute" registration for the 40 new buses for the registration of the 32 old ones, and they so advised plaintiff.[3]

At this point, evidently because of pressures from his Mexican counsel, plaintiff informed Dr. Garciagodoy that the "permit" would not be signed or issued except on condition that the defendant pay him in advance thereof the sum of $80,000.[4] Fol-

2. Plaintiff contends that he was employed by O'Sullivan as defendant's agent to render the necessary legal services to obtain the permits for the 40 buses, and that on June 15, 1978, O'Sullivan orally agreed, as such agent, to an $80,000 fee. There is not the slightest credible evidence that O'Sullivan had any authority to agree upon a fee, and we find he had none. As of June 15, 1978, plaintiff was dealing solely with O'Sullivan, a stranger to him. He made no effort to ascertain O'Sullivan's actual relationship to defendant or the nature and extent of his authority, particularly as concerned the amount of a fee. O'Sullivan (whom Dr. Garciagodoy finally concluded had defrauded him) did

not testify, although listed by plaintiff as a witness.

3. No such letter was ever written or signed. There is no corroborating or even credible evidence that any authorized Mexican official ever committed himself, even verbally, to any permit to defendant, much less a permit of the kind defendant required. So, too, there has been no explanation as to how 40 vehicles could be substituted for 32.

4. Although he recognized that no fee would be earned until the permits were issued and delivered to defendant, plaintiff insisted that as a "guarantee" of payment, the money be paid to

lowing Dr. Garciagodoy's refusal to pay that or any other amount before he had the permits "in hand" (in order to be assured that they sufficed for the desired purpose), Mexican counsel, without plaintiff's knowledge, filed with the Director of the Federal Registry of Vehicles a document withdrawing the application for "permission to substitute the buses", representing therein (falsely) that defendant had "lost interest" in obtaining the permit.

■ This case bristles with issues of veracity and credibility. In addition, there are inconsistencies within the testimony of the principals involved. Nevertheless, bearing in mind that the burden is upon plaintiff to prove his case by the preponderance of the evidence, we are of the firm conviction that plaintiff has failed to sustain that burden.

We expressly find that no authorized representative of defendant (and in particular Dr. Garciagodoy) ever agreed to pay plaintiff the sum of $80,000. There is no credible evidence that defendant is estopped by any actions, words or conduct to deny that it acquiesced in any such agreement. We further find that defendant never agreed to pay any fee to plaintiff in advance of the actual issuance of any permits,[5] and that the contract of employment did not contemplate any advance payment.

It is also clear that the "permit" which plaintiff contends was orally approved, but which was never issued, was not, in several respects, the kind of permit which the contract mandated he procure in order to earn a fee. What defendant wanted, and what plaintiff was commissioned to obtain, were duty-free conditional importation permits for 40 buses. Instead, without defendant's knowledge or consent, plaintiff, through his Mexican counsel abandoned any attempt to obtain such importation permits and instead applied to a different government agency for a permit under the newly enacted statute relating to "provisional inscription" of vehicles. In addition, even in the revised (ambiguous) application Mexican counsel filed, all that was asked was for authority to substitute newer buses for the *32* buses then being operated by defendant. Obviously, this application takes no account of defendant's desire to expand its fleet of buses. We have no doubt that even when the issue of the fee arose, defendant was not apprised that the permit plaintiff claimed had been orally approved for issuance was not the kind and character of permit the contract called for. And, as noted supra, we do not believe that even if the application to substitute 32 buses had actually been approved and signed, defendant would have been relieved of any obligation to pay import fees for the new buses.

■ We further find that even if the "new tactic" utilized by Mexican counsel might have resulted in a permit by which 32 buses could conceivably have been imported by defendant duty-free, the action of plaintiff through his Mexican associates in withdrawing the application therefor prior to the issuance of the permit on the false representation that defendant was no longer interested in obtaining the permit, would, under the circumstances, preclude plaintiff from recovering herein. It is strange indeed that after preventing defendant from obtaining the permit solely because he had not been paid and his fear that defendant might obtain the permit without having made payment therefor,

him in advance, representing that he would return the money if the permits were not forthcoming. Defendant had never agreed to any such condition.

**5.** Plaintiff testified, inter alia, that as early as May 27, 1978, he spoke by long distance telephone to Dr. Garciagodoy from Lumetta's office about a fee in the presence and hearing of both Lumetta and O'Sullivan, first in Spanish and then in English (the latter so that the others present could hear what he said). The telephone bill reflects that only the minimum (for a 3 minute call) was charged and that the entire call (which allegedly included preliminary conversation on the part of O'Sullivan) took less than 2 minutes. And if plaintiff felt it necessary to have witnesses to corroborate his statements, it is difficult to understand why he would not have prepared a *written* contract for defendant's signature. This is all the more true when he resumed his efforts in September after the two-day disagreement in mid-July.

plaintiff nevertheless seeks to recover the sum he contends defendant agreed to pay had the permit been granted. Admittedly, under plaintiff's own evidence, even if plaintiff were to recover in this action, defendant would get nothing whatever in return because of the conduct of plaintiff and his co-counsel.

Plaintiff has failed to sustain his burden of proof either under the original theories of express contract or fraud or under his belated theory of quantum meruit. To the extent our finding is based on credibility, it is adverse to plaintiff.

The foregoing memorandum constitutes our findings of fact and conclusions of law. Judgment will be entered in favor of defendant and against plaintiff.